## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARCO INTERNATIONAL, LLC,
a Pennsylvania limited liability
company,

       Plaintiff,

v.

COMO-COFFEE, LLC, a Delaware
limited liability company, and
COMOBAR, LLC, a Florida limited
liability company, and
CRAIG STEEN, individually,

       Defendants.

_____/

Case No. 17-cv-10502

Paul D. Borman
United States District Judge

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE (ECF NO. 9)

Plaintiff Marco International, LLC ("Marco") claims that Defendants Como-Coffee, LLC ("Como-Coffee"), Comobar, LLC ("Comobar"), and Craig Steen ("Steen"), (collectively Defendants), breached promises and agreements to make certain lump sum and guaranteed royalty payments to Marco in exchange for a license to use Marco's publicity rights, specifically the name and image of race car driver Marco Andretti. In lieu of filing an Answer, Defendants have filed a motion to dismiss this action based upon personal jurisdiction and improper venue. For the

1

reasons that follow, the Court DENIES the motion.

## I.      FACTUAL BACKGROUND

On or about December 2, 2014, Defendant Steen contacted John Caponigro, the President of Sports Management Network, Inc. ("SMN"), a Troy, Michigan based company that represents sports and entertainment figures and assists them, among other services, in obtaining commercial sponsorships.  Steen contacted Caponigro at his email address jc@sportsmanagementnetwork.com  and introduced himself to Caponigro as "the guy that called you about Marco and our Clear2there home automation filming that we are scheduled with Marco on the 14th for. [sic] Marco is all ready for us on that."  (ECF No. 14, Pl.'s Resp. Ex. 2, April 14, 2017 Declaration of John Caponigro, Ex. A, Dec. 2, 2014 Email from Steen to Caponigro, PgID 264.) Marco refers to the Indy Race Car Driver, Marco Andretti, who is a client of SMN and who apparently was doing a sponsorship video for a company called Clear2there, a provider of "smart home" technology, that was a client of Steen's.  *See* www.clear2there.com/smart-home

Steen's December 2, 2014 email to Caponigro confirms Marco's filming of a video for Clear2there and also introduces to Caponigro the concept of a possible sponsorship relationship with Marco Andretti for another client of Steen's, a "30 year old Italian coffee importer, out of Miami," i.e Comobar, with whom Steen's sister was

associated through marriage.  (Caponigro Decl. Ex. A, Dec. 2, 2014 Email, PgID 264.)

Steen states to Caponigro that "[w]e would like to have Marco endorse and help us

promote the coffee machine and coffee line."  (*Id*.)  Steen informs Caponigro that his

coffee importer client is a "fairly small player, but well established," holding "several

patents on expresso machines."  (*Id*. at PgID 265.)  Steen suggests the following

arrangement with Caponigro's client, Marco Andretti:

> Here is my proposal for Marco [sic] consideration.  First, he will need to like the coffee and machines.  We would send him a machine, asap and coffee to try.  I know he is a coffee drinker, etc.
>
> I would like to take advantage of the filming that we are doing with him on the 14th and have my crew film him drinking a cup of coffee, and standing beside a machine.  We can incorporate it into the other filming for Clear2there and the home automation.
>
> Add a $5K fee to him upfront for that endorsement, then we sign the revenue contribution going into 2015 with Word document attached.
>
>            *              *              *
>
> See what you think.  I will sign an Agency Agreement, if we can fit into this.
>
> I also have the Just Blab it, that I want to send you the outline for, the other Company that I am owners in.  But I will save that for another email. We are getting traction on it through UTA, United Talent Agency out of LA.  We may sign an exclusive with them for Celebs and Athletes, they want us to consider it.  I would hold out you and Marco on this, as an exception.
>
> Really want to get [y]our feedback on the coffee, as we would shot [sic]

those few shots next week at his house.

(Caponigro Decl. Ex. A, Dec. 2, 2014 Email, PgID 265.) Caponigro responded that same day:

> Thanks for sending this over. I am in Chicago this evening and tomorrow afternoon. Let's have a telephone discussion about this when I return. I will give you a call. Sounds very interesting. John C.

(*Id*. at PgID 264.) Steen responded later that same day:

> Sounds good. I am heading to Billings this evening so Thursday afternoon or Friday are best some time. Good company [Comobar], Paolo's 87 year old father had not expanded it, rightfully so. Those stubborn Italians!
>
> Talk to you than. [sic] I think the fact that everything is designed in Italy, Italian coffee, and endorsed by an Italian could be interesting marketing position.
>
> Are you a coffee drinker? Great coffee, have to send you machine and coffee too, if we pursue together.
>
> Craig L. Steen

(*Id*. at PgID 264.) On December 3, 2014, Steen sent the following email to Marco Andretti, informing him of his correspondence to Caponigro and the Comobar potential deal:

> Marco, I need to have some items shipped to your house for the shooting. Can I get your address? Also John and I are talking tomorrow or Friday on the Italian coffee. He said sounded interesting. I think your Italian heritage and the fact it is just great coffee, could make you some money.

(*Id.* at PgID 251, Dec. 3, 2014 Email from Steen to Andretti.)

Steen and Caponigro then had multiple email communications, with Steen sending a marked-up proposal to Caponigro in Michigan regarding Marco Andretti's sponsorship and royalty demands and representing that "Comobar is committed to move forward," with the agreement pending discussion of a number of "clarifications" that Steen attached to a January 2, 2015 email. (Caponigro Decl. Ex. A, Jan. 2, 2015 Email from Steen to Caponigro, PgID 252.) Steen states that: "The real endorsement from Marco is centered around the launch of the Comobar Marco Andretti endorsement and royalty program. . . . If you were available, I would even try to meet you in person on Thursday. I am done with my meetings in Memphis on Wednesday evening. I would be willing to come to you, if we could. . . . We are very appreciative of the opportunity and feel that these can be good revenue streams for all. Craig L. Steen." (*Id.*)

On January 5, 2015, Steen emails Caponigro to state that he will be arriving in Detroit on Thursday, January 8, 2015, that he has an appointment that afternoon, and would like to meet with Caponigro the morning of Friday, January 9, 2015. (Caponigro Decl. Ex. A, Jan. 5, 2015 Email from Steen to Caponigro, PgID 250.) Steen asks Caponigro to provide Steen with a draft contract for the Comobar deal "that [Steen] can review before Friday . . . to hopefully be in agreement and sign this

Agreement on Friday if possible." (*Id*. at PgID 249.) Steen further states that he "can provide the entity name that will be associated with this Agreement to you. It will most likely be Como-Coffee LLC." (*Id*.) Caponigro sends a return email, indicating that he can get an agreement together, but asks Steen to send him Como-Coffee's state of incorporation and the name and title of the person who will be signing the agreement. (*Id*.) Steen responds with the Arizona address of Como-Coffee, "Incorp. Delaware," and indicates that "Craig L. Steen" will be signing as "member partner." (*Id*. at PgID 248.) Steen indicates that "we [suggesting Steen/Como-Coffee and Comobar] set this up on 12/30/14, in anticipation of doing this with you." (*Id*.) (alteration added).

The meeting between Steen and Caponigro does take place on January 9, 2015, in Troy, Michigan. The parties ultimately sign the Sponsorship/Royalty Agreement later in January, with Steen sending scanned signatures to Caponigro in Troy and Caponigro executing and returning to Steen on January 26, 2015. (Pl.'s Resp. Ex. 1; Caponigro Decl. Ex. A, Jan. 26, 2015 Email Steen to Caponigro acknowledging receipt of signed agreement PgID 230-234.) The fully executed Agreement between Como-Coffee LLC and Marco is sent by email to Caponigro in Michigan by Steen on January 27, 2015. (Caponigro Decl. Ex. A, Jan. 27, 2015 Email from Steen to Caponigro, PgID 230-232.) These emails were followed by several emails between

Steen and Caponigro regarding performance under the January 26, 2015 Agreement, which appears to have to run into several snags, none of which is particularly relevant to the Court's resolution of the issue of personal jurisdiction and venue.

The January 26, 2015 Sponsorship/Royalty Agreement ("the Agreement") defines Como-Coffee as a Delaware Corporation with offices located at 3452 E. Jaeger Circle, Mesa, Arizona, defines Marco International, LLC as a Pennsylvania limited liability company with offices located at 471 Rose Inn Ave., Nazareth, Pennsylvania, and further defines Como-Coffee as maintaining "a representation and distribution agreement with Comobar, LLC; an importer and distributor of coffee and both industrial and consumer coffee machines." (ECF No. 9, Defs.' Mot. Ex. A, January 26, 2015 Agreement 1, PgID 88.) The Agreement generally provides that Marco Andretti agrees to allow Como-Coffee to utilize his personal name and likeness in conjunction with the "branding and sale of the products and services of COMO-COFFEE and Comobar." As demonstrated by the photographs depicting the proposed Comobar branding of potential advertising/marketing materials. (Defs.' Mot. Ex. A, Agreement at 1, PgID 88; Caponigro Decl. Ex. A, PgID 197-199, 224-229, .) The term of the Agreement commenced effective January 1, 2015 and was to continue for a period of three (3) years through December 31, 2017, unless terminated sooner under the terms of the Agreement. (Defs.' Mot. Ex. A, Agreement ¶ 2, PgID 89.) The

Agreement defined three (3) separate "contract years," Year One running from January 1, 2015 through December 31, 2015, Year Two from January 1, 2016 through December 31, 2016, and Year Three from January 1, 2017 through December 31, 2017. (*Id.*)

The Agreement further expressly provides that Como-Coffee agreed to supply *both* Plaintiff and SMN, at SMN's address in Troy, Michigan to the attention of John P. Caponigro, a copy of any and all marketing, advertising, promotional and press materials to be used in connection with the Agreement at least ten (10) business days before release to the public. (*Id.* ¶¶ 6 and 17, PgID 89, 94-95.) The Agreement authorizes either Plaintiff *or* SMN to disapprove of the proposed materials and to give notice to Como-Coffee of the same without unreasonable delay. (*Id.* ¶ 6.)

Under the Agreement, Plaintiff was to receive a royalty payment during each Contract Year based upon the sales revenue of "Comobar or other Comobar-affiliated brand unit sales," per a formula set forth in the Agreement. (*Id.* ¶ 7.) The Agreement provides for a minimum royalty payment for any one of the three given Contract Years of $45,000. (*Id.*) ("the Minimum Annual Guarantee"). The Agreement provides that the Minimum Annual Guarantee for each Contract Year shall be paid by Como-Coffee not later than January 30 following each Contract Year. (*Id.*) On January 11, 2016, Plaintiff invoiced Como-Coffee for the 2015 Minimum Annual

Guarantee due pursuant to the Agreement to be paid by January 30, 2016, with a check payable to Marco International, LLC c/o Sports Management Network, Inc., 1301 W. Long Lake Rd., Suite 250, Troy, Michigan 48098, Attn: Sev Tringali, the Controller at SMN. The Invoice was sent with a cover letter from Ms. Tringali on SMN letter head. (Pl.'s Resp. Ex. 4, January 11, 2016 Correspondence from Tringali to Steen with attached Invoice.)

In addition to granting Como-Coffee the right to use his image and likeness in connection with Como-Coffee and Comobar products and services, Marco also agreed that Como-Coffee would be a personal sponsor for Marco Andretti for individual Formula E (electric car) races. Plaintiff further agreed that Comobar's logo would be placed on Marco Andretti's driver suit and that Como-Coffee could use the image of Marco Andretti wearing the driver suit bearing the Como-Coffee/Comobar logo along with the image of his Formula E car, in the promotion and sale of its products. (Defs.' Mot. Ex. A, Agreement ¶ 7(b).) For this personal sponsorship, Como-Coffee agreed to pay Marco an additional $12,000 prior to each Formula E race. (*Id.*) The Agreement provided that Como-Coffee would participate as a personal sponsor of Marco Andretti in the 2015 Formula E race in Miami, Florida or, at the 2015 Formula E event in Long Beach, California in the event that Marco Andretti did not participate in the Formula E Miami race. (*Id.*) The "$12,000 per race" compensation due under

the Agreement for the Formula E sponsorship races (¶ 7(b)) is separate and distinct from the Royalty Payments due to Marco based upon sales of Comobar or other Comobar-affiliated brand products and the $45,000/year "Minimum Annual Guarantee" payment for each of the three Contract Years for such royalty amounts . (¶ 7(a)).

The Agreement also grants Marco access to the books and records of Como-Coffee, and requires Como-Coffee to submit to Marco, within thirty (30) days following the close of each Contract Year calendar quarter, an itemized statement of sales and revenue during the preceding Contract Year quarter, and to submit to Marco, within thirty (30) days of the close of each Contract Year, payment to Marco for any revenue earned under the royalty provisions of the Agreement during the preceding Contract Year.  (*Id*. ¶ 8.)

The Agreement provides for termination without penalty by either party on the occurrence of certain specified events, one of which is the failure to obtain prior approval from Marco or SMN for promotional materials.  (*Id*. ¶ 13, 13(b)(iii).)

The Agreement provides for Notice required under the Agreement to be sent: If to Marco: International LLC c/o Sports Management Network, Inc., 1301 W. Long Lake Road, Suite 250, Troy, Michigan 48098, Attention: John P. Caponigro; and If to Como-Coffee LLC: 3452 E. Jaeger Circle, Mesa, Arizona 85213, Attention: Craig

Steen.  (*Id.* ¶ 17.)

The Agreement provides that it shall be governed by and construed in accordance with the laws of the State of Pennsylvania.  (*Id.* ¶ 18.)

The Agreement is executed on behalf of Como-Coffee by Michelle Steen, its President and by Craig Steen, its Managing Member.  The Agreement is executed on behalf of Marco International, LLC by Marco Andretti, Its President and personally by Marco Andretti, the individual.  (Defs.' Mot. Ex. A, Agreement PgID 96.)

Finally, the Agreement bears the unequivocal Guarantee of Comobar, LLC, which provides as follows:

> Comobar, LLC guarantees to promptly satisfy all payment obligations pursuant to this Agreement in the event that COMO-COFFEE shall fail to make the requested payments hereunder on a timely basis.
>
> By:_____
>       Paulo Cometto
>       Member

(Agreement, PgID 96.)  The Guarantee bears the signature of Mr. Cometto, one of five members of Comobar, LLC, and was executed by Mr. Cometto in Italy and scanned and sent to SMN in Troy, Michigan via email by Mr. Steen.  (Defs.' Mot. Ex. C, March 8, 2017 Affidavit of Paolo Cometto ¶ 6; Caponigro Decl. Ex. A, PgID 232.)

Defendants submit the Affidavit of Craig Steen, who explains that he is the sole member and manager of Como-Coffee, LLC, which is a limited liability company

organized under the laws of Delaware with its principal place of business in Arizona. (ECF No. 9, Defs.' Mot. Ex. B, March 8, 2017 Affidavit of Craig Steen ¶ 2.)  Steen testifies that Como-Coffee does not conduct any business in the State of Michigan and does not have an office, agency, mailing address, post office box or telephone listing in the State of Michigan and does not advertise, call or otherwise solicit business in the State of Michigan.  (Steen Aff. ¶ 3.) Steen states that he is also President and CEO of Clear2There, LLC, a limited liability company organized under the law of Oklahoma with its principal place of business in Oklahoma.  (*Id*. ¶ 4.)  The business of Clear2There (primarily technology) is unrelated to the business of Como-Coffee (primarily coffee products).  (*Id*. ¶ 5.)

Steen testifies that his last trip to Michigan was over 2 years ago on January 8-9, 2015, on behalf of Clear2There, which paid all of Steen's travel expenses, meals and lodging while he was in Michigan.  Steen states that he was in Michigan for approximately 24 hours and while there he met with John Caponigro at 1301 West Long Lake Road, Suite 250, Troy, Michigan solely in his capacity as manager of Como-Coffee and not in his individual capacity or as an agent of Comobar LLC.  The January 9, 2015 meeting was the first time he met Mr. Caponigro in person and the meeting was not business related.  Steen states that "for a brief period" he and Caponigro discussed "the possibility of a sponsorship and endorsement relationship

12

between Como-Coffee and Marco Andretti, particularly with regard to an upcoming Formula E race in Miami, Florida." (*Id*. ¶¶ 6-9.) Steen states that no specific terms of such an agreement were discussed at the January 9, 2015 meeting with Caponigro. (*Id*. ¶ 10.) Steen states that on January 26, 2015, Como-Coffee entered into the Agreement with Plaintiff, which Steen executed in Mesa, Arizona, as the managing member of Como-Coffee. (*Id*. ¶11.) Steen denies the allegations of the Complaint that assert that he conducts business in Michigan, that the negotiation of the Agreement took place in Michigan or that the amounts due under the Agreement were payable in Michigan. (*Id*. ¶¶ 12-15.) Steen denies that either he or Como-Coffee's registered agent were served with the Summons and Complaint in this matter. (*Id*. ¶ 17.)[1]

Defendants also submit the Affidavit of Paolo Cometto, who states that he is a member and manager of Comobar, LLC, and that the other members of Comobar are

_____

[1] Each Defendant suggests in a single conclusory sentence that he/it has not been served with the Summons and Complaint in this matter. None of the Defendants makes any effort to develop this argument in any meaningful way and the Court declines to address any claim of insufficient service of process. it is well understood that issues "adverted to . . . in a perfunctory manner, unaccompanied by some effort at developed argumentation," are deemed waived. *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

Valentina Cometto, Cristina Nicolich, Juan Lorenzo and Gladys Loa, all of whom are residents of Florida. Mr. Cometto states that Comobar is a limited liability company organized under the laws of Florida and does not conduct regular or systematic business in Michigan. Comobar made one shipment to a third-party distributor in Michigan in 2014 and made another shipment to a restaurant in Michigan, but otherwise has conducted no business in Michigan. Comobar does not have an office or agency in Michigan, does not own or lease property in Michigan, does not have a mailing address, post office box, or telephone listing in Michigan and does not advertise, call or otherwise solicit business in Michigan. (Defs.' Mot. Ex. C, March 8, 2017 Affidavit of Paolo Cometto ¶¶ 1-5.)

Cometto states that on January 26, 2015, Comobar entered into the Agreement with Plaintiff and executed the Agreement in Ravenna, Italy. Cometto states that he has never had a direct communication with the Plaintiff, or with any of Plaintiff's agents, in Michigan or anywhere else, and neither has Comobar. Cometto is unaware of any provision of the Agreement that requires payments due under the Agreement to be made in Michigan. (*Id*. ¶¶ 6-10.) Cometto denies that he or Comobar has been personally served with the Summons and Complaint in this action. (*Id*. ¶ 11.)

## II.    STANDARD OF REVIEW

Plaintiff bears the burden of establishing, in response to Defendants' motion,

that personal jurisdiction exists. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). The Court has discretion to make a determination as to the existence of personal jurisdiction without an evidentiary hearing but plaintiff must, by affidavit, set forth specific facts demonstrating that the court has jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458-59 (6th Cir. 1991). A court must consider the pleadings and affidavits submitted by the parties in the light most favorable to the plaintiff and cannot credit "controverting assertions of the party seeking dismissal." *Id.* at 1459. Where there has been no evidentiary hearing, the plaintiff need only present a *prima facie* case in support of jurisdiction to defeat dismissal. *Id.* at 1458. *See also Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012) (observing that in order to defeat a motion to dismiss for lack of personal jurisdiction, the plaintiff's affidavits must only make out a *prima facie* showing and the pleadings and affidavits are viewed in the light most favorable to the plaintiff). The Court considers the facts presented here by competing affidavits and the *prima facie* standard of proof therefore applies. Plaintiff bears a "'relatively slight' burden at this stage of the proceedings." *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 901 (6th Cir. 2017) (quoting *Air Prods & Controls, Inc. v. Safetech*, 503 F.3d 544, 549 (6th Cir. 2007)).

## III. ANALYSIS

"A federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Neogen*, 282 F.3d at 888. Thus, jurisdiction over a non-resident defendant is permitted in Michigan if suit can be brought against the defendant under Michigan's long-arm statute without violating the due process requirements of the Constitution:

> A federal court sitting in diversity may not exercise jurisdiction over a defendant unless courts of the forum state would be authorized to do so by state law—and any such exercise of jurisdiction must be compatible with the due process requirements of the United States Constitution." *Int'l Techs. Consultants v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997) (citation omitted). Deciding whether jurisdiction exists is not an idle or perfunctory inquiry; due process demands that parties have sufficient contacts with the forum state so that it is fair to subject them to jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("[T]he Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." (internal quotation marks and citations omitted)). The court's jurisdiction accordingly extends only to those parties who have in some fashion placed themselves in the hands of the tribunal.

*Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012) (alterations in original).

Michigan's long-arm statute extends "limited" jurisdiction over nonresident corporations pursuant to Mich. Comp. Laws § 600.715, and "general" jurisdiction

over corporations pursuant to Mich. Comp. Laws § 600.711.[2] Michigan's long-arm statute also provides for "limited" jurisdiction over individuals pursuant to Mich. Comp. Laws § 600.705 and "general" jurisdiction over individuals pursuant to Mich. Comp. Laws § 600.701. Limited or "specific" jurisdiction focuses on the relationship between the litigation and the forum state:

> "Specific" or "case-linked" jurisdiction depends on an affiliatio[n] between the forum and the underlying controversy . . . in contrast to "general" or "all purpose" jurisdiction, which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (*e.g.* domicile).

*Walden v. Fiore*, 134 S. Ct. 1115, 1122 n. 6 (2014) (internal quotation marks and citations omitted) (alteration in original). We deal here only with limited or "specific" jurisdiction.[3]

---

[2] No Michigan statute expressly addresses jurisdiction over limited liability companies, such as Defendants Como-Coffee and Comobar in this case. "However, the personal jurisdiction rules governing corporations generally have been applied to limited liability companies as well. *Magna Powertrain De Mexico S.A. De C.V. v. Momentive Performance Materials USA LLC*, 192 F. Supp. 3d 824, 828 (E.D. Mich. 2016).

[3] The parties direct their briefing to the standards applicable to the Court's "exercise of limited personal jurisdiction" over the Defendants. (ECF No. 14, Pl.'s Resp. 5-11.) In a two-sentence footnote, with no effort at developed argument, Marco "suggests that this Court has general personal jurisdiction over Comobar based on the representations contained on its website (Exhibit 3) because it appears that it engages in continuous and systematic business in Michigan." (ECF No. 14, Pl.'s Resp. 8 n. 2, PgID 160) (citing Mich. Comp. Laws § 600.711). The Court need not entertain this

The Michigan Supreme Court has interpreted Michigan's long-arm statute as providing for the "broadest possible grant of personal jurisdiction consistent with due process.'" *Sports Auth. Mich., Inc. v. Justballs, Inc.*, 97 F. Supp. 2d 806, 810 (E.D. Mich. 2000) (citing *Sifers v. Horen*, 385 Mich. 195, 198-99 (1971)).  Because Michigan's long-arm statute has been interpreted as "extend[ing] to the limits imposed by federal constitutional due process requirements," the questions of (1) what is permissible under the Michigan long-arm statute and (2) what is consistent with federal constitutional due process necessarily merge and "become one."  *MAG IAS,*

_____

barebones "suggestion" and focuses its inquiry only on the exercise of limited personal jurisdiction over each of the Defendants.  As a threshold matter, it is well understood that issues "adverted to . . . in a perfunctory manner, unaccompanied by some effort at developed argumentation," are deemed waived. *Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012).  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).  In any event, the test for general jurisdiction over a corporation analyzes whether the defendant's "contacts with a State 'are so 'continuous and systematic' as to render them essentially at home in the forum State.'" *Magna Powertrain*, 192 F. Supp. 3d at 828 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  "[I]n *Daimler* the Supreme Court held that corporations (and by extension limited liability companies) are "at home" only in their place of incorporation or principal place of business." *Magna Powertrain*, 192 F. Supp. 3d at 828.  Comobar is a limited liability company formed under the laws of Florida and each of its members is a resident of the State of Florida. (ECF No. 1, Notice of Removal ¶ 10.)  Plaintiff advances no meaningful argument that would permit a finding that Comobar is "at home" in Michigan, as that term is understood in the context of the due process constraints on the Court's exercise of general jurisdiction.

854 F.3d at 899 (quoting *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (alteration added). *See also Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992) ("Under Michigan's long-arm statute, the state's jurisdiction extends to the limits imposed by federal constitutional due process requirements and thus, the two questions become one."). Thus, the Court proceeds directly to the constitutional due process analysis.

## A.     In Accordance with Due Process

"The due process clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). "By requiring that individuals have fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign, the Due Process clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* at 472 (internal quotation marks and citations omitted) (alteration in original).  Where a defendant "purposefully directs" his activities at residents of the forum state, that state has an interest in protecting its residents by "providing [them] with a convenient forum for redressing injuries

inflicted by out-of-state actors." *Id*. at 473 (alteration added). Where such purposeful conduct has occurred, the defendant can be assured that he will not be haled into a jurisdiction "solely as the result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id*. at 475 (internal quotation marks and citations omitted). "[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Id.* at 474 (quoting *Int'l Shoe*, 326 U.S. at 316).

The due process inquiry to determine "whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 134 S. Ct. at 1121 (internal quotation marks and citations omitted). The Sixth Circuit has long utilized a three-part test, first enunciated in *Southern Machine Co. v. Mohasco Ind., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968), to determine whether the exercise of specific personal jurisdiction over an out-of-state defendant comports with due process: (1) whether the defendant "purposely availed" himself of the privilege of "acting or causing a consequence" in the forum state; (2) whether the cause of action "arose from" defendant's activities in the forum state; and (3) whether defendant's acts or the consequences he caused have "a sufficiently substantial connection" with the forum state "so as to make the exercise of jurisdiction reasonable." *MAG IAS*, 854 F.3d at

20

899 (citing *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 680 (6th Cir. 2012)

quoting *Southern Machine Co. v. Mohasco Ind., Inc.*, 401 F.2d 374, 381 (6th Cir.

1968)).

Turning to an analysis of the contacts of each of the Defendants with Michigan,

the Court concludes that the Plaintiff has established a *prima facie* case for personal

jurisdiction over each of the Defendants.

### 1.    "Purposeful Availment"

"This 'purposeful availment' requirement ensures that a defendant will not be

haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated'

contacts, or of the "unilateral activity of another party or a third person . . . ." *Burger*

*King*, 471 U.S. at 475.   "In defining when it is that a potential defendant should

'reasonably anticipate' out-of-state litigation,

> [t]he unilateral activity of those who claim some relationship with a
> nonresident defendant cannot satisfy the requirement of contact with the
> forum State. The application of that rule will vary with the quality and
> nature of the defendant's activity, but it is essential in each case that there
> be some act by which the defendant purposefully avails itself of the
> privilege of conducting activities within the forum State, thus invoking
> the benefits and protections of its laws.

471 U.S. at 474-75 (internal quotation marks and citations omitted).

"The Supreme Court has said that purposeful availment exists if the defendant

created a 'substantial connection' with the forum state by engaging in 'significant

activities within [the] State,' or by creating 'continuing obligations' to residents in that state." *MAG IAS*, 854 F.3d at 900 (quoting *Burger King*, 471 U.S. at 475-76) (alteration in original). Through such conduct, a defendant "manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King*, 471 U.S. at 476. A defendant's physical presence in the state, while relevant to the purposeful availment inquiry, is not necessary:

> Jurisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."

*Burger King*, 471 U.S. at 476 (ellipsis added) (emphasis in original). *See also MAG IAS*, 854 F.3d at 900 (noting that physical entry into the forum, while not required, "is certainly a relevant contact") (citing *Walden*, 134 S. Ct. at 1122).

As an initial matter, Defendants argue that Plaintiff's own lack of contact with Michigan is relevant to the purposeful availment inquiry and weighs against a finding

of jurisdiction here. (ECF No. 9, Defs.' Mot. 7-8, PgID69-70; ECF No. 17, Defs.' Reply 17, PgID 276.) Defendants assert that the only reason the Plaintiff, a Pennsylvania limited liability company whose sole member is a Pennsylvania resident, filed suit in Michigan is because this is where Plaintiff's attorney is located. (*Id*. at 1, PgID 275.) Even assuming that Plaintiff is a Pennsylvania company with only a single Pennsylvania member, Defendants' assertion that the action was filed here simply to suit Plaintiff's attorney (presumably referring to Mr. Caponigro) ignores the true nature of the contractual relationship at the heart of this litigation. While the Plaintiff's law firm bears the Caponigro name, Mr. Caponigro has not filed an appearance in this case and his interactions with the Defendants that are the subject of this lawsuit, as discussed above, were taken solely in his role as the President of SMN, which serves as the management company for the Plaintiff Marco and multiple other athletes and entertainers. (Caponigro Decl. ¶¶ 1-3.) SMN is an athlete and celebrity management agency, and Mr. Caponigro is its President. (*Id*.) The fact that Mr. Caponigro is also an attorney and operates SMN out of the same office as the law firm of which he is a member is not a dispositive factor in defining his role in this litigation.

The numerous communications between Mr. Steen and Mr. Caponigro related to negotiating the Agreement clearly establish that Mr. Caponigro's contacts with Mr.

Steen were in his capacity as President of SMN, a company quite separate from the law firm that represents the Plaintiff in this action through attorneys other than Mr. Caponigro. The evidence submitted by Plaintiff in response to Defendants' motion suggests that all of the negotiations for this Agreement took place via emails sent by Steen to Caponigro in Michigan and vice versa, and during a personal visit by Steen (on his own initiative) to Michigan to meet with Mr. Caponigro to hammer out the details of the Agreement and to "hopefully be in agreement and sign" the Agreement in Michigan on that visit. (Caponigro Decl. Ex. A, Jan. 5, 2015 Email, PgID 249.) As counsel for Plaintiff explained at the hearing, SMN handles all of Mr. Andretti's business affairs, including negotiating contracts like the one at issue here on behalf of Mr. Andretti. "[T]he touchstone of personal jurisdiction . . . looks to the defendant's contacts *with the forum State itself*, not the defendant's contacts with persons who reside there." *AlixPartners v. Brewington*, 133 F. Supp. 3d 947, 959 (E.D. Mich. 2015) (emphasis in original) (internal quotation marks and citations omitted). "Regardless of Plaintiff's status as a forum resident, Defendant's actions established connections with Michigan, and those connections gave rise to this action." *AlixPartners*, 133 F. Supp. 3d at 959. So too here with Defendants' substantial contacts with SMN, Plaintiff's agent, in Michigan. The Court rejects Defendants' suggestion that the only connection between this litigation and Michigan

is the presence of Plaintiff's chosen law firm.  The Court places little weight, given this record, on the fact that the Plaintiff is a Pennsylvania limited liability company that has chosen to litigate its claims in this District.

### a.    Como-Coffee

As the numerous emails attached to Mr. Caponigro's Declaration clearly illustrate, it was Mr. Steen, on behalf of Como-Coffee and also representing Comobar, who reached out to Plaintiff in Michigan through Mr. Caponigro to establish a sponsorship/royalty agreement with Marco Andretti.  Through these emails, Steen set forth his "proposal for Marco's consideration," emphasizing the common Italian heritage between Comobar, and specifically Mr. Cometto, and Marco as enticements for Marco's favorable consideration of the deal.  As discussed at length above, the emails reveal that Steen drove the deal as much or perhaps more than Caponigro, and Steen, not Caponigro, suggested that Steen come to Michigan specifically to meet with Caponigro to "hopefully be in agreement and sign" the Agreement during the Michigan meeting "if possible." (Caponigro Decl. Ex. A, Jan. 5, 2015 Email, PgID 249.)  The emails sent by Steen to Caponigro (acting throughout as Plaintiff's agent) in Michigan were numerous and qualitatively substantial.  *See MAG IAS*, 854 F.3d at 901 ([T]he issue is not the quantity, but the quality of a defendant's contacts with the forum state.")  Although Steen only visited Michigan once, in the context of this deal,

the email communications are significant to the due process analysis. "'[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.'" *AlixPartners*, 133 F. Supp. 3d at 958 (quoting *Burger King*, 471 U.S. at 476).

While Mr. Steen suggests in his Affidavit that his meeting in Michigan with Mr. Caponigro on January 9, 2015 was "just to get to know each other" and did not involve a discussion of any details of what ultimately became the Agreement, this assertion is directly contradicted by the emails between Mr. Steen and Mr. Caponigro that preceded that meeting. In fact, Mr. Steen asked for and received from Mr. Caponigro a draft of the Agreement in advance of the meeting, and Steen stated his intention to "sign the Agreement on Friday [at the January 9, 2015 meeting] if possible." (Caponigro Decl. Ex. A, PgID 249.) Many of the details of the Agreement had been exchanged between Mr. Steen and Mr. Caponigro in advance of the January 9, 2015 in-person meeting at SMN's offices in Troy, Michigan. Even if the evidence did not overwhelming establish these facts, which it does, the Court cannot consider Defendants' controverting assertions for purposes of resolving this motion. Additionally, while Mr. Steen suggests that the meeting with Mr. Caponigro was just an afterthought on a trip for another client, Mr. Steen was the one who suggested that

he "would be willing to come to [Mr. Caponigro in Michigan]" to "hopefully sign" the Agreement, which Steen and Caponigro had discussed in great detail prior to the January 9, 2015 trip to Michigan, including specifically which Formula E races Mr. Andretti was planning to participate in for purposes of the sponsorship portion of the Agreement. (Caponigro Decl. Ex. A, PgID 252.)

In addition to affirmatively reaching out to Plaintiff through Mr. Caponigro at SMN in Michigan, and negotiating the terms of the Agreement through multiple emails to and from Mr. Caponigro in Troy, Michigan, Como-Coffee executed, through Mr. Steen, and Comobar guaranteed, an Agreement that provided for Notice of proposed advertising to be sent to SMN in Michigan for approval. (Agreement ¶¶ 6, 17.) Finally, SMN invoiced Como-Coffee, on behalf of Plaintiff, for the Year One Contract Minimum Annual Guarantee payment of $45,000 to be remitted to SMN's offices in Troy, Michigan. (Pl.'s Resp. Ex. 4, Jan. 11, 2016 Correspondence, PgID 269-70.) Although Defendants dispute that the Agreement specified where payments would be remitted, the language of the Agreement does not address the issue. For purposes of this jurisdictional analysis, the Court must take all facts in the light most favorable to the Plaintiff and cannot credit Defendants' controverting assertions. *Theunissen*, 935 F.2d at 1459. Thus, the Court assumes that the parties understood that payment would be remitted to SMN in Michigan. Indeed this is logical given that

the relationship underlying this Agreement was between Steen and Caponigro and the Agreement specifically provides the address of SMN, and Caponigro specifically, as authorized to receive Notices under the Agreement at the Troy, Michigan address. There is no evidence in the record that would suggest that payments would be sent anywhere other than to Caponigro in Michigan, as the agent of Marco. Viewing the facts in the light most favorable to the Plaintiff, Plaintiff has sufficiently established Como-Coffee's purposeful availment through these substantial contacts.

### b.    Craig Steen

Steen states in his Affidavit that he did not take any action with respect to the Agreement in his individual capacity. However, the Sixth Circuit has rejected such efforts by corporate agents who have otherwise been actively involved in forum-related contacts to shield themselves from the court's exercise of personal jurisdiction over them individually:

> While it is true that "jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation," *Weller v. Cromwell Oil Co.*, 504 F.2d [927 (6th Cir. 1974)]at 929, we hold that the mere fact that the actions connecting defendants to the state were undertaken in an official rather than personal capacity does not preclude the exercise of personal jurisdiction over those defendants. Hence, where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment.

> *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). This proposition has been applied by other circuits in the exercise of personal jurisdiction over corporate officers who actively and personally involved themselves in conduct violating the Lanham Act, notwithstanding the fact that the defendants acted as agents when they did so. *See, e.g., Committee for Idaho's High Desert v. Yost*, 92 F.3d 814, 823–24 (9th Cir. 1996); *Electronic Laboratory Supply Co. v. Cullen*, 977 F.2d 798, 807–08 (3d Cir. 1992); *Polo Fashions, Inc. v. Craftex, Inc*., 816 F.2d 145, 149 (4th Cir. 1987); *Donsco, Inc. v. Casper Corp*., 587 F.2d 602, 606 (3d Cir.1978).

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 698 (6th Cir. 2000).

*See also Murtech Energy Servs., LLC v. Comenco Sys., Inc.*, No. 13-cv-12721, 2014 WL 2863745, at *11 (E.D. Mich. June 24, 2014) (citing *Balance Dynamics* and noting that both Michigan courts and the Sixth Circuit have rejected the "fiduciary shield doctrine," which "does not constitute a valid argument against a Michigan court's exercise of personal jurisdiction over a nonresident individual defendant who otherwise falls within the scope of Michigan's long-arm statute.") (internal quotation marks and citation omitted). Which Mr. Steen does here, as discussed at length above.

Indeed, Plaintiff sues Steen individually for fraud. (Compl. Count III.) As discussed above, Steen negotiated the Agreement and Plaintiff alleges that Steen made promises to Plaintiff through Caponigro and SMN regarding performance under the Agreement. Through evidence of Steen's contacts with Caponigro and SMN in

Michigan, which were initiated by Steen, Plaintiff has sufficiently established Steen's purposeful availment through these substantial contacts.

### c.    Comobar

Comobar was the entity named in the subject line of each of Steen's emails to Caponigro at the initiation of the discussions regarding the Comobar/Como-Coffee deal and remained the "subject" of the emails throughout the contract negotiations related to the Agreement, up until the actual signing of the Agreement.  And it is the Comobar name that is displayed prominently on the proposed promotional materials exchanged between the parties and Comobar's owner's "shared Italian heritage" with Mr. Andretti that Steen used to entice interest in the Comobar deal.  We know from the terms of the Agreement that Comobar is an importer and distributor of coffee and coffee and machines and that Como-Coffee represents and distributes Comobar products.  (Agreement PgID 96.) Mr. Steen's emails prior to the January 9, 2015 meeting in Michigan noted the subject as "Comobar License Agreement," or "Comobar Endorsement," and the company name that appears in the promotional materials exchanged between Steen and Caponigro bears the  "Comobar" logo. (Caponigro Decl. Ex. A, PgID 248-265.)  Not until Mr. Caponigro asked for the name and title of the person who would be signing the Agreement did Steen begin to refer to "Como-Coffee" in the subject line of his emails.  For example, on January 5, 2015,

Steen wrote to Caponigro: "[I]f you have a Contract Agreement for *Comobar*, that I can review before Friday, I would like to. I want to hopefully be in agreement and sign this Agreement on Friday if possible. I can provide the entity name that will be associated with this Agreement to you. It will most likely be Como-Coffee LLC." (Caponigro Decl. Ex. A, PgID 249.) (Emphasis added).

Finally, and critically, Comobar signed an unconditional guarantee of all of Como-Coffee's obligations under the Agreement. Clearly, Comobar is an entity receiving the benefit of the Agreement with Plaintiff, clearly Steen was negotiating on behalf of Comobar (who appears as a separately named party in the Agreement) throughout the deal, and Comobar signed the Agreement as a Guarantor. Defendants protest that Mr. Cometto, a member of Comobar and the individual who signed the guarantee on behalf of Comobar, has never had direct communications with Plaintiff. But Plaintiff is not suing Mr. Cometto individually in this action. Viewing the facts in the light most favorable to the Plaintiff, Plaintiff has made a *prima facie* showing of Comobar's purposeful availment.

### 2. Arising From

The "arising from" prong of the *Southern Machine* test is satisfied if "a defendant's contacts with the forum state are related to the operative facts of the controversy." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996).

"'The law of this circuit is that the 'arising from' requirement is satisfied if the cause of action is 'related to' or 'connected with' the defendant's forum contacts.'" *Youn v. Track, Inc.*, 324 F.3d 409, 419 (6th Cir. 2003) (quoting *Third Nat'l Bank in Nashville v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1091 n. 2 (6th Cir. 1989)) . In this instance, this litigation does arise from the contacts between Steen, on behalf of Comobar and Como-Coffee, and Caponigro, on behalf of Marco, related to the negotiation of the Agreement and subsequent efforts to resolve the parties' disagreement over each others' performance under the Agreement. This prong is easily satisfied here.

### 3.    "Reasonableness"

"Where, as here, the first two criterion [of *Southern Machine*] are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet this third criteria.'" *Air Prods and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 554 (6th Cir. 2007) (quoting *Theunissen*, 935 F.2d at 1461) (alteration added). "In determining reasonableness, the court should consider: 1) the burden on the defendant; 2) the interest of the forum state; 3) the plaintiff's interest in obtaining the relief sought; 4) another state's interest in securing resolution of the matter." *Air Products*, 503 F.3d at 554–55.

None of these factors weighs against exercising jurisdiction here. There will be a burden on the Defendants but there will also be a burden on the Plaintiff

(specifically on Marco Andretti). Although Defendants suggest that this Court should transfer this case to Florida in the event that it determines it does have personal jurisdiction over the Defendants, Florida is only convenient for Comobar (Mr. Steen and Como-Coffee are citizens of Arizona). Defendants plea for Florida also ignores the fact that the Agreement selects Pennsylvania law to govern the interpretation and enforcement of the Agreement. And counsel for Defendants acknowledged at the hearing that Defendants would not favor Pennsylvania as an alternative forum. Although the Agreement's choice of law is not dispositive, it certainly would be a consideration in determining what might be a more "reasonable" location than this District for the litigation to proceed. *See* discussion *infra* at Section IIIB.

With regard to Michigan's interest in this litigation, the evidence establishes that this Agreement was negotiated in substantial measure in Michigan between Steen (on behalf of Comobar as the producer/guarantor and Como-Coffee as a distributor) on the one hand and Caponigro (on behalf of Plaintiff as its management company) on the other. Also, the Agreement called for Notices of approval of the Comobar advertising that is at the heart of the Agreement to be sent to and approved by SMN in Michigan and the evidence suggests that payments under the Agreement were to be remitted to SMN in Michigan. As counsel for Plaintiff pointed out at the hearing, the Defendants only obligation under the Agreement was to make the Minimum Annual

Guarantee payment and sponsorship payments – the Agreement did not obligate the Defendants to use any of the advertising or marketing materials: "COMO-COFFEE's entire obligation hereunder may be discharged by the payment of the applicable consideration provided herein." (Defs.' Mot. Ex. A, Agreement ¶ 12.) Michigan has an interest in having a contract that was negotiated in Michigan, and calls for partial performance in this State, enforced here. *See AXA Winterthur*, 694 F.3d at 680 (suggesting that where terms of a contract are to be performed in the forum state, due process may be satisfied by requiring a party to litigate in that forum).

## B. Defendants' Motion to Dismiss for Improper Venue or to Transfer Venue

Defendants ask the Court, alternatively, to either dismiss this action for improper venue or transfer this action to the Southern District of Florida. The Court DENIES this motion.

### 1. Improper Venue: 28 U.S.C. § 1391

Defendants argue that, for the same reasons that personal jurisdiction is not proper in this District, neither is venue. 28 U.S.C. § 1391 requires only that a "substantial part" of the events or omissions giving rise to the claim have occurred in the forum district. "[P]laintiff may file his complaint in any forum where a substantial part of the events or omissions giving rise to the claim arose; this includes any forum

with a substantial connection to plaintiff's claim." *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998). As the Sixth Circuit explained in *Bramlet*:

> The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as "substantial" activities took place in A, too. Indeed, district A should not be disqualified even if it is shown that the activities in district B were more substantial, or even the most substantial. Any other approach would restore the pinpointing problem that created the difficulties under the now discarded "claim arose" standard. If the selected district's contacts are "substantial," it should make no difference that another's are more so, or the most so.

141 F.3d at 263 (quoting David D. Siegel, Commentary on the 1988 and 1990 Revisions of Section 1391, Subdivision (a), Clause (2), 28 U.S.C.A. § 1391 (1993)).

As discussed above, Plaintiff makes out a *prima facie* case establishing significant contacts between the present controversy and the State of Michigan. It matters not that there may also be substantial contacts to be found in Florida. The contract was formed in Michigan between Steen (Comobar/Como-Coffee), a resident of Arizona, and Caponigro (Marco) in Michigan. Defendants were willing to perform by mailing proposed advertising materials and payment to Michigan. The Court concludes that a substantial part of the events giving rise to this dispute, i.e. the initial solicitation of Plaintiff by Steen, negotiation of the Agreement through the multiple emails sent by Steen to Caponigro in Michigan and Steen's personal visit to Michigan, took place in this District and venue is proper in this Court.

## 2. Transfer of Venue: 28 U.S.C. § 1404(a)

In lieu of a dismissal for improper venue, Defendants seek to have this action transferred to Florida. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "In making this decision, the Court must determine whether: (1) the action could have been brought in the proposed transferee-court; (2) a transfer would promote the interests of justice; and (3) a transfer would serve the parties' and the witnesses' convenience." *Thomas v. Home Depot, U.S.A., Inc*., 131 F. Supp. 2d 934, 936 (E.D. Mich. 2001).

The movant bears the burden of demonstrating that "fairness and practicality strongly favor the forum to which transfer is sought." *Id*. (quoting *Rowe v. Chrysler Corp*., 520 F. Supp. 15, 16 (E.D. Mich. 1981)). "The movant must make this showing by a preponderance of the evidence." *Id*. (citing *Int'l Union, U.A.W. v. Aluminum Co. of Am.*, 875 F. Supp. 430, 433 (N.D. Ohio 1995)).

As discussed above, Florida is convenient only for Comobar, whose members reside in Florida. Steen resides in Arizona and will have to travel regardless of where the litigation proceeds. Plaintiff will have to travel in either case, to Michigan or to Florida. Defendants have not made the showing that Florida is strongly favored in this

case.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the Defendants' Motion to Dismiss or, in the Alternative, Motion to Transfer Venue (ECF No. 9). Defendants are ORDERED to Answer Plaintiff's Complaint within fourteen (14) days of the date of this Order.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: June 15, 2017

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 15, 2017.

s/Deborah Tofil
Case Manager